Reset Form

FILED
U.S. District Court
District of Kansas

NOV 0 2 2026

Clerk, U.S. District Court
By JPK Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Andrew K. Gill
(Enter above the full name of Plaintiff(s))

vs.

Textron Aviation Inc
Name

2900 SW. Wanamaker Dr. Suite 204
Street and number

Topeka Ks 66614
City State Zip Code

(Enter above the full name and address of Defendant in this action - list the name and address of any additional Defendants on the back side of this sheet.)

Case Number: 6:26-cv-1401-EFM-BGS
(To be assigned by Clerk)

## EMPLOYMENT DISCRIMINATION COMPLAINT

1. This employment discrimination lawsuit is based on (check only those that apply):

[X] Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, for employment discrimination on the basis of race, color, religion, gender, or national origin.
**NOTE**: *In order to bring suit in federal district court under Title VII, you must first obtain a right-to-sue letter from the Equal Employment Opportunity Commission.*

[ ] Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621, *et seq.*, for employment discrimination on the basis of age (age 40 or older). **NOTE**: *In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file charges with the Equal Employment Opportunity Commission.*

[ ] Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.*, for employment discrimination on the basis of disability.
**NOTE**: *In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a right-to-sue letter from the Equal Employment Opportunity Commission.*

[X] Other (Describe)

Supplemental Kansas Common Law Defamation Per Se.

2. If you are claiming that the discriminatory conduct occurred at a different location than the address provided for Defendant, please provide the following information:

(Street Address) (City/County) (State) (Zip Code)

3. When did the discrimination occur? Please give the date or time period:

From the Fall of 2021 continuously through present day Oct 2026 ongoing Corporate blacklist tracking.

## ADMINISTRATIVE PROCEDURES

4. Did you file a charge of discrimination against Defendant(s) with the Kansas State Division of Human Rights or the Kansas State Commission on Human Rights?

[ ] Yes Date filed: ______________

[X] No

5. Did you file a charge of discrimination against Defendant(s) with the Equal Employment Opportunity Commission or other federal agency?

[X] Yes Date filed: Oct 28, 2026 Case 563-2026-04851

[ ] No

6. Have you received a Notice of Right-to-Sue Letter?

[X] Yes [ ] No

If yes, please attach a copy of the letter to this complaint.

7. If you are claiming ***age discrimination***, check one of the following:

[ ] 60 days or more have passed since I filed my charge of age discrimination with the Equal Employment Opportunity Commission.

[ ] fewer than 60 days have passed since I filed my charge of age discrimination with the Equal Employment Opportunity Commission.

## NATURE OF THE CASE

8. The conduct complained of in this lawsuit involves (check only those that apply):

- [ ] failure to hire me
- [ ] termination of my employment
- [ ] failure to promote me
- [ ] failure to accommodate my disability
- [x] terms and conditions of my employment differ from those of similar employees
- [x] retaliation
- [x] harassment
- [ ] reduction in wages
- [x] other conduct (specify):

Systemic Internal recruitmant portal blacklist track and bad faith demographic profiling defamation.

Did you complain about this same conduct in your charge of discrimination?

[x] Yes [ ] No

9. I believe that I was discriminated against because of (check all that apply):

- [ ] my race or color, which is ____________
- [ ] my religion, which is ____________
- [ ] my national origin, which is ____________
- [x] my gender, which is [x] male; [ ] female
- [ ] my disability or perceived disability, which is ____________
- [ ] my age (my birth year is: ____________)
- [ ] other: ____________

Did you state the same reason(s) in your charge of discrimination?

[x] Yes [ ] No

10. State here, as briefly and clearly as possible, the essential facts of your claim. Describe specifically the conduct that you believe is discriminatory and describe how each defendant is involved in the conduct. Take time to organize your statement; you may use numbered paragraphs if you find it helpful. It is not necessary to make legal arguments, or to cite cases or statutes.

See item 10 supplemental

# 10. ITEM TEN SUPPLEMENTAL INFORMATION

## A. PREAMBLE & PROFESSIONAL CAPACITY

1. Plaintiff Andrew K. Gill has been continuously employed by Defendant Textron Aviation Inc. since 2017, currently serving as an exempt, salaried Leader Value Stream (Value Stream Leader) on the active Latitude manufacturing line.

2. Plaintiff holds two bachelor's degrees, maintaining an 8-year record of unblemished performance, zero prior infractions, and extensive operational contributions to the corporation's high-level manufacturing automation and Continuous Improvement (CI) data projects.

## B. THE HISTORICAL REPORTING TRACK & CORPORATE INDIFFERENCE

3. In or around the Fall of 2021, Plaintiff was subjected to an escalating, severe pattern of workplace harassment driven by his line manager. While this initial adversarial environment was not overtly gender-related at its inception, Plaintiff's supervisor actively engaged in "fishing expeditions" for pretexts in a deliberate operational attempt to manufacture reasons to terminate Plaintiff's employment.

4. In direct response to this targeting, Plaintiff initiated a formal internal compliance escalation, presenting himself directly to HR Representative Erin Krohta in an intensely distraught state, openly crying in fear for his livelihood, and explicitly requesting corporate protection and support.

5. Despite receiving direct, high-level notice of Plaintiff's acute psychological distress and a clear report of floor harassment, Erin Krohta and Defendant's human resources department failed to execute any corrective follow-up, open an internal review track, or implement protective boundaries to insulate Plaintiff's position.

6. Plaintiff engaged in consistent, repeated inquiries for support from Defendant's human resources department over a multi-year window to resolve the ongoing floor hostility. Defendant met Plaintiff's inquiries with absolute institutional indifference, failing to intervene and leaving the adversarial manager dynamic fully active.

7. This multi-year corporate failure to address Plaintiff's appeals for support left Plaintiff entirely unprotected, directly permitting the hostile floor dynamics to compound, and allowing human resources to subsequently shift their targeting mechanisms into overt sex-based discrimination and retaliation.

8. In or around December 2024, human resources representative Noelle Selden weaponized this uncorrected environment to initiate an unauthorized, out-of-scope tracking campaign targeting Plaintiff, maliciously interfering with his professional peer and internal networking footprint.

9. Specifically, Noelle Selden intervened in a benign, compliant internal email interaction between Plaintiff and HR colleague Kelly Truong regarding eyewear, improperly invoked a false "duty to warn" without any policy basis or safety threat, and threatened Kelly Truong with immediate termination if she continued communicating with Plaintiff.

10. Value Stream Manager Anthony Tagtow and Value Stream Coordinator Sukie Ricker directly witnessed Noelle Selden's aggressive, unprofessional conduct; Anthony Tagtow explicitly intervened and put Noelle Selden on notice that her secret inquiries into Plaintiff's personal dating life were entirely out of bounds.

## C. THE COMPLIANT PROJECT COLLABORATION & SUB-ROSA FISHING EXPEDITION

11. Noelle Selden spent several months running an unannounced, secret "fishing expedition"—interrogating manufacturing line operators behind closed doors—actively publishing an unfounded, highly toxic cloud of suspicion over Plaintiff's name across multiple lines without ever placing Plaintiff on notice or level-setting his position.

12. On Tuesday, June 2, 2026, from 12:00 PM to 1:30 PM, Plaintiff, his current manager Nick Taylor, and team members were formally scheduled by Organizer James Hole for an active cross-functional corporate project at the West Campus CI Center titled 'OMS Data Analyzation Latitude and Longitude VSLs 1st Shift'.

13. Melanie Mendez HTML was an explicitly logged corporate invitee and project collaborator assigned directly to this Continuous Improvement (CI) data group, establishing a direct, documented professional connection on this project on Tuesday, June 2, 2026.

14. Following this initial June 2, 2026 project alignment, Continuous Improvement partner James Hole and team member Melanie Mendez came directly to Plaintiff's morning production area to participate in mandatory, daily 'OMS Board Walks' conducted at exactly 7:15 AM, establishing an active, daily face-to-face team connection to strictly review work center metrics and data.

15. On June 23, 2026, Plaintiff utilized the LinkedIn external platform to execute a 100% compliant, standard professional follow-up text directly to his daily project collaborator, Melanie Mendez, strictly regarding their mutual work scope and continuous improvement tracking, stating: "Hi Melanie!, how you like working in continuous improvement". This communication was a direct continuation of their Tuesday, June 2, 2026 West Campus assignment and subsequent daily 7:15 AM operational OMS board walks, violating zero corporate policies.

16. On or around August 13, 2026, Plaintiff discovered through an employee with direct knowledge that Noelle Selden and Andrea Rinkenbaugh were actively approaching line operators under Plaintiff's reporting structure, asking leading and highly prejudicial questions regarding whether they had "witnessed Plaintiff harassing a woman or any woman".

16.A. Specifically, on Thursday, August 13, 2026, at exactly 11:54 AM, HR Partner Andrea Rinkenbaugh executed a personal device summons commanding Plaintiff: "As soon as lunch is over, can you please send [Employee Witness No. 1] to the COC to meet with me? He does not need union representation, but can have it if he'd like.". This communication documents

that human resources was actively conducting secret, sub-rosa interrogations of Plaintiff's direct reports behind closed doors—four days prior to the August 17 career threats—without providing Plaintiff with formal notice or level-setting his position.

17. On July 17, 2026, at exactly 10:00 AM, Plaintiff's current manager on the Latitude line, Nick Taylor, commanded Plaintiff to his office; at 1:47 PM that same afternoon, Plaintiff's former manager on the XLS line, Mathew Albers, separately text-messaged Plaintiff stating, "Hey can you chat".

18. In separate, un-level-set manager meetings on July 17, 2026, both Latitude line manager Nick Taylor and XLS line manager Mathew Albers explicitly informed Plaintiff that his professional "brand was in question" and that his upward mobility and career advancement at Textron Aviation were entirely frozen, while repeatedly refusing to disclose the underlying allegations, dates, or factual basis.

19. Immediately following these career threats on July 17, 2026, Plaintiff entered an intensely distraught state, suffered a severe emotional breakdown on company property, and openly wept before HR representative Kayleen To while reporting the bad-faith profiling, the multi-year history of unaddressed floor harassment, and the career blockades.

20. Under standard good-faith human resources protocols and established professional duty of care, Defendant's representatives had an absolute, immediate obligation to fully disclose the nature, scope, and genesis of their sub-rosa tracking campaign to Plaintiff during this acute reporting meeting.

21. In late July or early August 2026, due to the continuous psychological pressure on the floor, Plaintiff suffered a second visible emotional breakdown at the W7 HR facility, which was witnessed directly by Danica McLaughlin, Andrea Rinkenbaugh, and other HR staff members, all of whom were uniformly female.

22. Despite Plaintiff coming forward completely distraught on these two separate, explicit occasions, Defendant's human resources representatives purposefully concealed the

existence of their operational investigation, remaining entirely silent and leaving Plaintiff to endure extreme, unmitigated levels of vocational stress, anxiety, and severe emotional distress for an entire month without ever formally informing him that his professional position was being actively targeted.

23. Defendant's administrative duty of care and standard notice protocols required an immediate disclosure to Plaintiff during the first July 17, 2026 reporting meeting alone, as concealing an active investigation from an employee experiencing acute workplace distress constitutes a severe deviation from objective human resources standards.

24. Furthermore, Defendant's purported "affirmative duty to investigate" a demographic or intern-based complaint was completely satisfied and required no further operational action the moment Defendant reviewed the underlying core evidence.

25. An objective review of Plaintiff's June 23, 2026 LinkedIn text revealed with absolute clarity that the communication was 100% professional, strictly work-related, and directly tied to an active, scheduled corporate project collaboration.

26. Because the text contained zero sexually provocative, inappropriate, or non-compliant language, any lawful basis for a corporate investigation died immediately upon that review.

27. By deliberately extending the tracking campaign beyond this point—interrogating floor operators, weaponizing highly prejudicial framing, and manufacturing severe career discipline in the absolute absence of a corporate policy violation—Defendant's legal and compliance shield completely dissolved.

28. Consequently, Defendant's continuation of the sub-rosa tracking campaign transforms the entire operation from a routine compliance review into an explicit, bad-faith pretext for intentional sex-based discrimination, demographic profiling, and unlawful retaliation.

## D. THE RETALIATORY FLOOR AMBUSH & SEPTEMBER 3 SEQUENTIAL REJECTIONS

29. At all times relevant to these discriminatory actions, every single Human Resources representative managing, executing, and concealing this sub-rosa investigation—including Erin Krohta, Noelle Selden, Kayleen To, Danica McLaughlin, Andrea Rinkenbaugh, Kari Moore, and Director Jennifer Whitfield—was female.

30. This uniform demographic composition within Defendant's human resources and labor relations tier directly facilitated the highly biased, gender-targeted enforcement mechanisms and the metricless profiling weaponized against Plaintiff as a male supervisor.

31. On August 18, 2026, an operational disagreement occurred between Latitude line manager Nick Taylor and Plaintiff regarding a standard 504 unit-swap authorization for a tailcone replacement.

32. Plaintiff requested that Director Jay Robert mediate the operational dispute; instead, Director Jay Robert cut Plaintiff off, refused to review the underlying unit-swap paperwork, and initiated an aggressive, hostile verbal ambush on the active production floor.

33. Specifically, Director Jay Robert and Line Manager Nick Taylor began loudly shouting and yelling at Plaintiff directly on the floor, openly berating his professional competence in front of multiple active manufacturing engineers, engineering staff, and XLS manufacturing line operators.

34. In an explicit effort to mitigate the public hostility, de-escalate the floor ambush, and maintain professional decorum, Plaintiff explicitly requested that they immediately cease the shouting, move off the production floor, and continue the operational conversation inside the human resources department.

35. Director Jay Robert flatly refused Plaintiff's protective request to continue the conversation in HR, instead maintaining the public floor targeting, shouting, "You need to own your quality," and aggressively declaring in front of the assembled floor workers that Plaintiff worked for him and not the other way around.

36. Director Jay Robert then aggressively snapped his finger at Plaintiff, commanded, "Let's go," and physically marched Plaintiff across company property toward the human resources department in an overt, highly visible public display intended to imply Plaintiff was facing immediate termination.

37. Upon arriving at the human resources office, the building was vacant and no human resources representatives were physically present to intake the dispute.

38. As a direct result of the vacant office, Director Jay Robert, Line Manager Nick Taylor, and Plaintiff returned to the production line to physically inspect the specific aircraft unit in question.

39. Directly at the aircraft, Plaintiff walked through the engineering dockets and explained with complete technical accuracy that the quality issue was completely out of his team's scope, demonstrating it was an isolated supplier component defect rather than an internal build error.

40. Upon being confronted with this objective manufacturing data, Director Jay Robert shifted his posture, stated, "Thank you," and walked away from the aircraft with Nick Taylor present, completely abandoning the quality allegations.

41. Following this operational ambush, Plaintiff immediately sent a formal clarifying email to Director Jay Robert to explain the technical process, establish that he meant no disrespect, and identify an independent inspector (Highfield) who can vouch for the technical compliance of the paperwork; Director Jay Robert refused to respond, maintaining the silent administrative setup.

42. Around this time, Latitude line manager Nick Taylor launched an un-measured, highly selective attendance review targeting Plaintiff, attempting to enforce bad-faith attendance discipline against an exempt, salaried employee with unlimited PTO by mischaracterizing a total of nine scattered days of absence. In truth, these absences were compressed into highly isolated medical incidents: a 3-day time frame caused by an acute case of strep throat supported by clear doctors' notes, a 3-day time frame caused by a severe back injury

supported by separate physical doctors' notes, and 3 final days consisting of approved, pre-arranged academic exam dates under Defendant's corporate education program.

43. Value Stream Manager Ray Jackson, a peer supervisor and manager on the adjacent Longitude manufacturing line, was present during this level-set and directly witnessed Nick Taylor refusing to permit Plaintiff to fully present, discuss, or submit his valid medical and clinical notes, documenting a coordinated, bad-faith campaign to manufacture a false disciplinary record.

44. On August 19, 2026, at 11:53 AM, Noelle Selden sent a personal-device summons demanding Plaintiff attend a 12:10 PM meeting; Plaintiff replied at 11:57 AM stating the line misunderstanding was resolved, but Noelle Selden aggressively insisted on proceeding, creating the first forum where Plaintiff finally realized the bad faith genesis of his multi-week professional hardships.

45. During this August 19, 2026 interview, Noelle Selden aggressively opened the session by declaring she had a report that Plaintiff "talked to two young girls," weaponizing highly prejudicial phrasing before any facts were established, while continuously failing to provide Plaintiff with any formal corporate notice of an active investigation.

46. Plaintiff immediately executed a protected confrontation, directly calling out Noelle Selden on the record regarding her prior bad-faith targeting of HR colleague Kelly Truong, her highly out-of-scope floor questioning methods, and her severe manipulation of Defendant's legal and institutional compliance shield. Confronted with this precise, unyielding resistance, Noelle Selden completely backed down, ceased the interrogation line, and told Plaintiff he was free to leave the meeting and return to the active production floor.

47. On September 2, 2026, Plaintiff finalized and formally filed a comprehensive, multi-page internal corporate harassment grievance and an explicit, retroactive Federal Litigation Record Preservation Hold directly to the inbox of Senior Vice President of Human Resources Maggie Topping.

48. Inside this permanent paper trail, Plaintiff explicitly issued his first chronological mandate to Senior Vice President Maggie Topping, demanding that the corporation fully freeze, preserve, and isolate any and all communication chains across all corporate devices and emails containing any and all mentions of his name, or keywords such as "predators" and "young girls." Plaintiff explicitly specified that this legal hold applied to all records and files generated during the specified months and years by the named supervisors and personnel, including Noelle Selden, Andrea Rinkenbaugh, Danica McLaughlin, Nick Taylor, Jay Robert, and Mathew Albers, as well as any internal HR mention of his name.

49. Senior Vice President Maggie Topping sent an electronic server confirmation formally acknowledging receipt of Plaintiff's protected whistleblower grievance and active litigation hold parameters at exactly 8:40 AM on Thursday, September 3, 2026.

50. On that exact same morning—Thursday, September 3, 2026—Defendant's centralized human resources and recruitment infrastructure executed an immediate, career-blocking portal update shifting Plaintiff's application for the Value Stream Leader ACC (Job ID: 344328) track to "declined". This occurred sequentially right after the grievance was received, despite a successful prior interview track with ACC Value Stream Manager James Noel, locking in further pretext and retaliation across parallel advancement tracks.

51. At exactly 10:46 AM on Thursday, September 3, 2026, HR Representative Noelle Selden and Director Jay Robert shadow-ambushed Plaintiff, pulling him off the manufacturing floor into a closed-door office to execute a severe career penalty labeled as a Written Reprimand in Lieu of Suspension (DAF6325).

52. During this 10:46 AM disciplinary ambush, Director Jay Robert issued an immediate threat of termination to Plaintiff, declaring that Plaintiff would face further disciplinary action up to termination if his operational performance did not show immediate improvement. Director Jay Robert explicitly weaponized psychological floor surveillance on the record, threateningly declaring: "Everybody's watching. Leaders, yourself, the next level, the next level, Noel, everybody watches. So it doesn't matter. What you do, just remember that someone is always watching. They watch everything you do every day." Plaintiff directly confronted Director Jay

Robert regarding the metricless and unsubstantiated nature of the penalty, explicitly stating: "Can you give me something with the exact metrics that you would like me to accomplish, so I don't have any confusion on that, sir?".

53. Confronted with Plaintiff's precise demand for objective metrics, Director Jay Robert explicitly confessed to the metricless, bad-faith nature of the corporate penalty, directly admitting on the record: "I'm not going to say yes, I'm going to give you something on that... there isn't, like, it didn't necessarily a metric for a behavior.". This explicit confession definitively confirmed that no performance data rows existed in company files to support the termination threat or the disciplinary action.

54. Concurrently, during that exact same meeting, HR Representative Noelle Selden explicitly utilized direct demographic and sex-based profiling to link the career penalty to Plaintiff's compliant external professional networking footprint, declaring on the record that the corporate targeting operation was: "because of the young girls you messaged".

55. At exactly 1:43 PM on that exact same afternoon, 177 minutes after the floor write-up was executed, Defendant's internal recruitment portal generated a sequential electronic rejection terminating Plaintiff's application for a second targeted track, the Supervisor Aftermarket Expediting (Job ID: 343798) position. This rapid, interlocking succession established an unalterable electronic footprint of direct, manual internal blacklisting.

56. At exactly 1:52 PM on that afternoon, 186 minutes post-discipline, Plaintiff executed an immediate, urgent digital follow-up email directly to Senior VP Maggie Topping, putting executive leadership on direct, contemporaneous notice that the 10:46 AM floor write-up was a flagrant, bad-faith breach of anti-retaliation policies, stating that the action was a "flagrant breach of corporate compliance, confidentiality, and anti-retaliation policies," and formally requesting an immediate administrative stay to insulate his position.

57. Immediately following this ambush on September 3, 2026, Plaintiff suffered an acute physical and psychological crisis on company property due to the extreme corporate hostility, forcing him to immediately leave the floor and seek emergency medical attention at the on-site

Premise Health C-5 occupational clinic.

58. Plaintiff's contemporaneous electronic health charts from the on-site Premise Health clinic on the afternoon of September 3, 2026, formally document Plaintiff experiencing dangerous, skyrocketing blood pressure spikes, severe clinical anxiety, and acute trauma directly caused by the human resources ambush.

58.A. On Thursday, September 17, 2026, at 1:23 PM—while Plaintiff's September 2 formal whistleblower grievance was actively live and under review by Labor Relations Director Clark Goetzinger—HR Partner Andrea Rinkenbaugh executed a selective, retaliatory attendance audit targeting Plaintiff's department. This audit occurred despite Plaintiff explicitly demanding immediate corporate insulation and protection from the very HR personnel named in the tracking grievance. Rinkenbaugh maliciously accused Plaintiff of failing to assess unexcused time for [Bargaining Unit Employee No. 1] and [Bargaining Unit Employee No. 2] on August 31, 2026, even though unalterable system logs from the MetLife and Federal FML databases (Absence Nos. E3652NH25995 and C8197JE26117) document that these targeted dates consisted of valid, open, and approved medical leave. Permitting an under-investigation HR agent to bypass executive holds and force a salaried supervisor to retroactively falsify timecards—solely to manufacture a post-hoc business necessity for a metrics-free write-up—establishes continuous, bad-faith retaliation and an active corporate cover-up.

58.B. This chronological sequence exposes an un-measured, systemic sex-based double standard across Defendant's uniform, female-led human resources division. Defendant's representatives spent over two months executing an unannounced, sub-rosa tracking campaign, interrogating line workers, and manufacturing career-blocking discipline based entirely on a 100% compliant external professional text message to a project collaborator. Concurrently, Defendant met Plaintiff's repeated, face-to-face reports of severe workplace distress, clinical medical absences, and explicit requests for support with absolute institutional indifference for four consecutive years. This flagrant disparity in corporate due diligence demonstrates that Defendant selectively weaponized its internal compliance shield to target, profile, and isolate Plaintiff based entirely on his gender as a male supervisor.

## E. THE SEPTEMBER 24 RATIFICATION & ONGOING RECRUITMENT PORTAL SECLUSION

59. On September 24, 2026, Human Resources Director Jennifer Whitfield and Labor Relations Director Clark Goetzinger conducted a formal corporate review tracking Plaintiff's September 2 grievance, with Director Clark Goetzinger explicitly stating: "I wanted to put some closure to that complaint you sent, Maggie, and give you a voice... I'm telling you, I've investigated this thing. And Andrew, I can't substantiate any of your claims. Like, I can't substantiate that Noel targeted you.".

60. Plaintiff directly confronted Director Clark Goetzinger regarding the bad-faith profiling driving the current disciplinary action, noting that his outreach was a standard professional text to an assigned project collaborator that occurred entirely off-property on an external professional network outside corporate jurisdiction. Plaintiff explicitly highlighted that because the communication was a professional outreach over LinkedIn, it took place completely outside Textron Aviation infrastructure, confirming that the company's investigation and subsequent discipline were entirely meritless and lacked legal or operational jurisdiction. Director Clark Goetzinger explicitly admitted that the company's un-measured tracking and subsequent floor discipline were triggered entirely by a demographic profile complaint involving an intern, stating: "She had a complaint about you, and when we get complaints, like, this came from an intern, right? A young female intern, but we get those complaints, we are obligated to investigate those, right?". In direct response, Plaintiff itemized the continuous multi-year reporting track, stating: "It just feels like every step that I've gone, I've asked for support from HR for four years straight. It's in that paperwork right there. Nobody came and followed up with me one time, Clark. You know? You know? And I'm telling you, beyond me sending information to Maggie, asking people to intervene, that same day I had Alber's harassing me. I escalated it to Nick Taylor and no one did anything. I cried in front of all of you guys' team in the COC saying, I'm being harassed. All of my attendance infractions are covered under medical infractions. I had to go out of my way, go get FMLA because I have celiac disease.".

61. During this highly adversarial exchange, Labor Relations Director Clark Goetzinger actively attempted to shift full institutional accountability onto Plaintiff, aggressively trying to force a verbal concession or admission of corporate policy infraction from Plaintiff by stating on the record: "You are pointing fingers at everybody... it's all everybody else's fault. I have not heard you say one time that, 'Yeah, maybe I did something wrong here or maybe I did something wrong there.' I have not heard that, not one time.". Plaintiff further stated this as it destroys Nick Taylor's write up over his attendance as: "Well, I would say this. I, as a VSL, was already supposed to have unlimited ETO within reason, okay? The only times that I took ETO was when I threw out my back, and I had strep throat, and I can go in 15, 20 minutes to go get documentation from plain healthy right now, Clark. And then, three other absences, I was taking exams, because I've been an honorable student utilizing our education program here. So, I'm sorry, like, dude, I didn't do anything wrong, and I've been following every protocol necessary to ask for support from you guys.".

62. Plaintiff stood his ground with total absolute factual compliance, unyielding data metrics, and clear recollection, immediately shutting down the corporate defense trap by stating: "That's 'cause I didn't do anything wrong. It's on record. And not one person wants to step up and say, You know, maybe some of those things were out of bounds, you know? Like, I told you, I worked with continuous improvement for years. I spoke to Mrs. Mendoza on LinkedIn. That is not part of Textron Aviation. You guys had no jurisdiction to investigate me over that. I said nothing inappropriate, sir. Mrs. Truong. We are friends to this day, Clark, and you've seen the e-mail chain that I showed you months afterwards. She didn't complain on anything. Not Once, again, Noel was out of her jurisdiction with that as well going around sharing my business with Jay Robert's, Albers, and all in the COC office." Jeniffer and Clark had no reply or defense and ratified my complaints with their silence.

63. Plaintiff then immediately proceeded to itemize the entire structural timeline of his multi-year reporting track directly to Director Clark Goetzinger's face, exposing how the corporation had systematically ignored his repeated, documented appeals for support, stating: "I've asked for support from HR for four years straight. It's in that paperwork right there. Nobody came and followed up with me one time, Clark... Erin Krohta didn't do anything for me

four years ago when I told her I was being harassed by Albers on the line. I cried, and I told her I was scared for my job. Not once did she follow up with me. I cried in front of all of you guys' team in the COC saying, I'm being harassed." Again Jennifer Whitfield and Clark ratified my complaint and its validity with their silence.

64. Plaintiff explicitly pushed back on the historical validity of Human Resources' past tracking campaigns and interventions, exposing how Noelle Selden had previously targeted Plaintiff's benign professional networking interactions with a colleague outside of text-policy constraints. Labor Relations Director Clark Goetzinger openly conceded that the past tracking campaign involving HR colleague Kelly Truong did not stem from an official complaint, but was an un-measured intervention by Noelle Selden, admitting: "I know exactly what happened in situation... She saw that you were, you were, uh, hanging around Kelly, and she said, she just told Kelly, 'Be careful. You gotta be maintained a professional relationship.' That is what she told her. And guess what, that's, that's 100% the truth.".

65. Labor Relations Director Clark Goetzinger confirmed that the corporation would flatly refuse to implement administrative relief or review the multi-year environmental targeting, explicitly declaring to Plaintiff: "You have provided me lots and lots of documentation, in your opinion and your perspective, on all of this... and I've read everything... And I'm closing this out today, okay? That're we're doing today.".

66. Labor Relations Director Clark Goetzinger flatly rejected each administrative remedy on behalf of the corporation, itemizing Plaintiff's requested relief sequentially and stating: "Your request to rescind the discipline, that's not gonna happen. 105,000 pay adjustment that's not gonna happen. $45,000 a lump sum. That's not gonna happen. So essentially, I cannot substantiate your claims. So the requests that you've made, those are not gonna happen...".

67. Immediately following this sweeping corporate rejection, Plaintiff issued his second chronological litigation hold warning directly to Labor Relations Director Clark Goetzinger and Human Resources Director Jennifer Whitfield, reminding them under active record-preservation mandates to immediately isolate and freeze all records, emails, text chains, and mentions of his name, along with key terms like "predators" and "young girls," on

any corporate server or device owned by any party labeled in the complaint or any individual within the HR tier.

68. Director Clark Goetzinger and Human Resources Director Jennifer Whitfield subsequently issued a blanket corporate ratification of the non-metric discipline file, forcing Plaintiff to rely entirely on federal statutory paths by stating: "but what I would tell you is the EEOC complaint that you have filed. We will work and comply with any requests the EEOC has for us, and we'll work through that. Okay?... Yes, there's a process we'll follow.".

69. Plaintiff then executed his third chronological record-preservation reminder during his subsequent formal follow-up meeting with Human Resources Director Jennifer Whitfield, explicitly putting the HR department on direct notice that all communication logs, internal HR discussion notes, corporate email networks, and mobile threads containing his name or malicious profiling keywords remained bound to a permanent, unalterable federal litigation hold.

70. Following these protected disclosures, Defendant's departments actively weaponized the non-metric DAF6325 file to enforce a systematic career blockade against Plaintiff. Specifically, the Aircraft Completion Center (ACC) hiring tier—led by James Noel and Director B.J. Bryant—maintains an interconnected operational workflow with Latitude Line Director Jay Robert and HR Partner Noelle Selden, meeting face-to-face on a weekly basis during mandatory corporate 'Master Schedule Meetings' to coordinate aircraft production timelines. Defendant permitted these under-investigation supervisors to actively use these weekly Master Schedule Meetings to disseminate unverified, defamatory rumors regarding Plaintiff's "brand," directly poisoning the selection process and causing James Noel's department to reject Plaintiff's supervisor track advancement following his successful interview. Without any manual disclosure of a disciplinary record by Plaintiff, Defendant's internal hiring portal generated sequential transfer application rejections that arrived exactly one day and two hours apart, documenting the unalterable electronic footprint of a manual, centralized corporate blacklist track driven by this direct inter-departmental collusion.

71. On Wednesday, October 7, 2026, at 12:21 PM, in an effort to circumvent this coordinated corporate blacklist loop and identify local placement opportunities, Plaintiff sent a formal electronic query directly to HR Business Partner Kari Moore regarding an active internal opening for Job ID: 345216. At all times relevant, HR Business Partner Kari Moore functions within a direct, day-to-day corporate communication tier alongside Noelle Selden, Danica McLaughlin, Andrea Rinkenbaugh, and Executive Director Jay Robert's active Aircraft Completion Center (ACC) deployment staff, participating in shared internal tracking databases and personnel assignment review blocks.

72. On Thursday, October 8, 2026, at exactly 7:33 AM, Defendant's centralized human resources and recruitment automation network delivered an immediate, system-generated electronic rejection completely terminating Plaintiff's candidacy for the targeted Aircraft Delivery Manager position (ID 345216), filtering him out prior to any recruiter review.

73. Exactly six minutes later, at 7:39 AM on Thursday, October 8, 2026, Defendant's recruitment portal generated a second, parallel electronic blockade, delivering a rapid rejection that terminated Plaintiff's separate application for the upward-mobility Value Stream Leader ACC track position (ID: 344547).

74. At 3:06 PM on that exact same afternoon—nearly eight hours after the automated server system had already forcefully rejected and closed out Plaintiff's applications—HR Business Partner Kari Moore delivered a deceptive electronic response to Plaintiff's October 7 inquiry, falsely advising him to apply for the role and inquire later, completely concealing the fact that the internal portal blockade had already manually rejected his profile.

75. This chronological sequence documents an unalterable electronic pattern of automated recruitment portal seclusion, demonstrating that Defendant's human resources and labor relations tier maintains an active, centralized electronic script that automatically blockades Plaintiff's name across all internal advancement channels, regardless of individual position merit or recruiter context.

76. By flatly refusing to rescind the non-metric disciplinary action (DAF6325) and failing to distribute correcting communications to all affected branch and department managers to "correct the record," Defendant's executive leadership, human resources tier, and labor relations division have effectively and collectively allowed Plaintiff's professional reputation to remain permanently tarnished across the corporation's infrastructure. This institutional failure to correct the known false narrative directly maintains a toxic cloud of suspicion over Plaintiff's name, cementing the ongoing retaliatory career blockades and ensuring the continuous destruction of his professional standing within the aerospace industry.

**11. REQUEST FOR RELIEF**

As relief from the allegations of discrimination as stated above, Plaintiff prays that the court grant the following relief to Plaintiff:

**A. FINANCIAL COMPENSATORY DAMAGES (UNCAPPED)**

1. Back-Pay Award: An order awarding Plaintiff full Back-Pay, including lost base wages, shift differentials, performance bonuses, health benefits, and 401(k) matching contributions, retroactively accumulated from the initial reporting point in the Fall of 2021 through the date of final judgment, due to the systematic and uncorrected long-term career stagnation and hostile environment, together with pre-judgment interest.

2. Front-Pay Award: An order awarding Plaintiff long-term Front-Pay calculated across a 15-year career projection, factoring in his two bachelor's degrees and the lost executive trajectory toward a corporate Vice President level, due to the systematic portal blockade.

3. Presumed Defamation Damages: An order awarding compensatory damages for the severe, permanent injury to Plaintiff's professional reputation, standing, and character within the aerospace industry, legally presumed under Kansas law for Defamation Per Se

Defamation Per Se.

**B. STATUTORY REMEDIAL AND PUNITIVE DAMAGES**

1. Punitive Damages: An order awarding the maximum $300,000 statutory cap for Punitive and Compensatory Damages under Title VII of the Civil Rights Act, due to Defendant's malicious intent, direct demographic profiling, and reckless

institutional indifference to Plaintiff's civil rights. 2. [X] Costs and fees involved in litigating this case.

**C. EQUITABLE ADMINISTRATIVE REMEDIES**

1. Expungement of Records: An order directing Defendant to completely expunge, delete, and erase the non-metric

disciplinary action (DAF6325) and all associated defamatory summaries from Plaintiff's permanent personnel file, internal human resources directories, and centralized recruitment servers.

2. Injunction Against Retaliation: A permanent injunction prohibiting Defendant, its officers, and its floor managers from engaging in further tracking, surveillance, career blocking, or retaliatory adverse treatment against Plaintiff or any supporting witnesses.

(Attach additional sheets as necessary).

11. The acts set forth in paragraph 10 of this complaint:
- [X] are still being committed by Defendant.
- [ ] are no longer being committed by Defendant.
- [ ] may still be being committed by Defendant.

12. Plaintiff:
- [X] still works for Defendant
- [ ] no longer works for Defendant or was not hired

13. If this is a ***disability-related claim***, did Defendant deny a request for a reasonable accommodation?
[ ] Yes [ ] No

Explain:

## REQUEST FOR RELIEF

As relief from the allegations of discrimination as stated above, Plaintiff prays that the court grant the following relief to Plaintiff: (check any and all that apply)
- [ ] Defendant be directed to employ Plaintiff
- [ ] Defendant be directed to re-employ Plaintiff
- [ ] Defendant be directed to promote Plaintiff
- [X] Defendant be directed to See typed attached continuation Pages For complete request for relief. (item 10)

☐ Injunctive relief (please explain): ______________________

☐ Monetary damages (please explain): ______________________

☒ Costs and fees involved in litigating this case

☒ As additional relief to make Plaintiff whole, Plaintiff

seeks: See attached typed continuation pages for complete Request for Relief.

and such other relief as may be appropriate, including attorney's fees, if applicable.

Signed this _____ day of ____________________, 20____.

Andrew K. Gill
Signature of Plaintiff

Andrew K. Gill
Name (Print or Type)

3431 E Aster, Derby, KS
Address

Derby, Kansas, 67037
City State Zip Code

316-570-3349
Telephone Number

**DESIGNATION OF PLACE OF TRIAL**

Plaintiff designates { ☒ Wichita, ☐ Kansas City, ☐ Topeka}, Kansas as the location for the trial in
(Select One Location)
this matter.

Andrew K. Gill
Signature of Plaintiff

**REQUEST FOR TRIAL BY JURY**

Plaintiff requests trial by jury. ☒ Yes ☐ No
(Select One)

Andrew K. Gill
Signature of Plaintiff

Dated: ______________

(Rev. 10/15)